IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SIGRAM SCHINDLER BETEILIGUNGSGESELLSCHAFT mbH,[1] | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. 09-72-SLR |
| CISCO SYSTEMS, INC., | ) ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| CISCO SYSTEMS, INC., | ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civ. No. 09-232-SLR |
| SIGRAM SCHINDLER BETEILIGUNGSGESELLSCHAFT mbH, | ) ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

At Wilmington this 26th day of July, 2010, having heard oral argument on, and having reviewed the papers submitted in connection with, the parties' proposed claim construction;

IT IS ORDERED that the disputed claim language of the patents in suit, U.S.

---

[1]Pursuant to and as described in the court's memorandum opinion of the same date, the court substitutes Schindler Beteiligungsgesellschaft mbH ("SSBG") for Teles AG Ingormationtechnologien and refers to SSBG throughout this order.

Patent Nos. 6,954,453 ("the '453 patent"), 7,145,902 ("the '902 patent") and 7,483,431 ("the '431 patent"), as identified by the above referenced parties, shall be construed consistent with the tenets of claim construction set forth by the United States Court of Appeals for the Federal Circuit in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), as follows:[2]

1. A "**connection**" or "**communications connection**" is a pathway between end-terminals through which data are transferred and which is established after the completion of call set-up;

"**Changing over . . . during the existing transfer**" and "**changing over . . . without interruption of the communications connection**" require that the change-over occur during the communications connection between end-terminals, i.e., after completion of call set-up and during the voice or audio phase of the call; and

"**Changing over . . . without interruption of a call set-up procedure**" also requires that the change-over occur during the communications connection between end-terminals, i.e., after completion of call set-up and during the voice or audio phase of the call.

The problem solved by the invention was how to use internet telephony without interrupting the real-time transfer of data, i.e., a telephone conversation. *See* '902 patent at col. 3:25-28. The prosecution, reexamination history and specification are

---

[2]The parties have identified dozens of disputed terms. The court has construed the terms most essential in view of the parties' infringement positions and positions regarding the validity of the '431 patent. Because the court has elected to stay its consideration of the validity of the '453 and '902 patents pending a final determination on the merits of the reexaminations of those patents, the court did not construe every term identified by the parties.

replete with references to this problem, the solution being a dynamic change-over from packet-switching to line-switching without having to terminate the call and start over. *See, e.g., id.* at col. 1:46-47; col. 2:22-25; col. 9:48-56; claims 34, 84, 92, & 100.

There are no references in the specification or claims to a telephone call having three distinct phases. During prosecution of the '902 patent, the applicants described the voice (second) phase of a call as "involv[ing] setting up a connection for transmission of voice signals between the caller and the called station," preceding "the transfer of voice signals" for the duration of the call. (D.I. 276 at JA2145) The applicants traversed the examiner's § 102 rejection based on U.S. Patent 6,069,890 to White et al. during prosecution of the '902 patent on the basis that the invention discloses change-over during the "second or third phase of the telephone call, when the digitized speech is sent over an internet connection." (D.I. 276 at JA2146-47) SSBG cannot now recover forfeited claim scope.[3] Additionally, claims 84, 92 and 100 of the '902 patent each contemplate that the control device first "establishes" a communication connection for data transfer, and then later refer to "changing over . . . without interruption of the communications connection." Such a connection must exist before it may be interrupted.

In the copending '902 patent reexamination, SSBG has emphasized that the

---

[3]Although the "changing over . . . without interruption of a call set-up procedure" language is arguably broader on its face, the "changing over" language must be construed consistently with the applicants' statements to the examiners that change-over during an ongoing communications connection is an essential feature of the invention. The court's construction of this limitation is not inconsistent with the plain language of the claim, insofar as a change-over occurring in the voice phase cannot interrupt the set-up of that connection, which occurs prior to the establishment of that phase.

inventors conceived a method for changing over during "ongoing real time data transfers representing a telephone call or similarly time-sensitive communications connections, from a packet-switching network to a line-switching network, without interruption of the end-terminal-to-end-terminal communications connection whose data is being transferred." (D.I. 284 at JA10938-39) SSBG has interchangeably referred to the change-over occurring "during an end-terminal-to-end-terminal data transfer (with 'first data' of a particular communications connection being sent to the packet-switching network, and 'second data' of the same communications connection being sent to the line-switched network)." (*Id.* at JA10939, n.5)

The court rejects SSBG's contention that the invention has any relevance to the call set-up phase of a telephone call, since there is no real-time problem to address before the conversation begins. Notably, SSBG's position is in direct contrast to statements made during the reexaminations of the '453 and '902 patents. On reexamination of the '902 patent, SSBG highlighted the inventive feature as "changing over during a real-time, end-terminal-to-end-terminal data transfer, without interruption" of that "end-terminal to end-terminal communications connection whose data is being transferred." (D.I. 284 at JA10939) During reexamination of the '453 patent, SSBG has specifically told the PTO that the limitation "during the existing transfer" requires the transfer of data to the second end terminal, and

> begins to exist in White only after the called station goes off-hook and the Internet virtual connection is completed, col 6:24-26 – because from then on the audio signals received by the first switch from the calling phone (= first end terminal) are transferred to the called phone (= second end terminal) through the Internet. But White nowhere discloses any change-over of a data transfer after this point in time col. 6:24-26, i.e. during the then existing transfer.

4

(D.I. 278 at JA4275) During a later interview with the examiner, "[t]he inventor pointed out that the claim limitation 'during the existing transfer' as used in the specification, means that a connection to a second end terminal is established." That SSBG would advocate the opposite construction before this court is perplexing.

2. **"Means responsive to a control signal for changing over"** is the control device 71. The function is changing over from a packet-switching mode of transfer of the first data of the telephone call to a line-switching mode of transfer of the second data of the telephone call without interruption of the communications connection.

The parties agree that the control device 71 is corresponding structure; SSBG asserts that the limitation also literally includes any "control devices for performing the change-over" known in the art and appreciated by persons of ordinary skill in the art as being capable of the function of responding to a control signal. (D.I. 247 at 19 & n.66-67)

A corresponding structure for purposes of 35 U.S.C. § 112, ¶ 6 must be disclosed within the four corners of the patent or clearly within the intrinsic record. *See Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1208 (Fed. Cir. 2002) ("Structure disclosed **in the specification** is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.") (citation omitted) (emphasis added). The specification provides specific guidance with respect to the control devices provided in figure 4:

> The internal control commands, as to whether a packet switching is to take place through the IP switch or a line switching is to take place through the line switching device 73, are produced in a control device 71. The device 71 is substantially a switch which forwards the incoming data either as data packets to

> the IP switch 72 or as bit flow to the line switching device 73. To this end, the control information of the incoming data are evaluated. The change-over control unit 711 monitors and controls which open connections are present (i.e., which and how many data channels are connected) and which bandwidth the individual data channels require.
>
> In detail the control device 71 has a change-over control unit 711, two packeting/unpacketing devices 713 and 714, and an intermediate register 712. The change-over control unit is connected to a topography data bank 75 which contains geographical data for a number of IP addresses.

('902 patent, col. 8:59 – col. 9:9) In view of this specific disclosure, the court concludes that the "means responsive to a control signal for changing over" limitation is limited to the control device 71. See *Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1377 (Fed. Cir. 2008) (limiting claim to a structure of one figure and structural equivalents) (citations omitted).

In support of its argument that the patents provide a more general description of a control device, SSBG identifies the following passages:

> (1) "A switch according to the present invention has a packeting device for packeting and unpacketing data, an IP switching device for establishing connections for switching through data channels and a control device which directs incoming data either to the IP switching device or to the line switching device depending on the control signals." ('902 patent, col. 3:51-57)
>
> (2) "A packet switch, alias packet switching apparatus, is also called a router, an IP switch or a host computer." (*Id.*, col. 1:44-45)
>
> (3) "In addition where applicable, an ATM interface and an interface with a mobile phone network can also be provided." (*Id.*, col. 8:37-38)
>
> (4) "The implementation of the switches 7a and 7b [of figure 1] takes place selectively through hardware or software. The line switching is thereby preferably implemented by hardware and the packet-switching by software. Thus with line switching, after switching through a connection the data are forwarded without further examination, whilst with packet switching the destination address of each data packet is evaluated and the next IP switch has to be selected from the routing tables. A switching device for the switches 7a and 7b which undertakes a change-over between packet and line switching is

preferably likewise implemented as software." (*Id.* at col. 7:37-47) (D.I. 207 at 25 & n.41-44) The disclosures called out by SSBG do not expand the guidance provided in the specification with respect to the control devices illustrated in figure 4.

Additionally, during prosecution of the '453 patent, the applicants specifically iterated to the examiner that "means responsive to a control signal for transferring to a line-switching transfer or a packet-switching transfer to the second end terminal **are** a control device 71." (D.I. 274 at JA1035) (emphasis added) SSBG's current arguments that the "means for" claims cannot be limited solely to the devices of figure 4 contradicts its prior assertions in this regard.[4]

"[B]oth § 112 ¶ 6 and the doctrine of equivalents apply similar analyses of insubstantiality of the differences between a disclosed structure and an accused infringing structure," but "an important difference between the two inquiries involves the timing of the separate analyses for an 'insubstantial change.' Namely, an equivalent structure under § 112 ¶ 6 must have been available at the time of the issuance of the claim, whereas the doctrine of equivalents can capture after-arising technology developed after the issuance of the patent." *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1099-1100 (Fed. Cir. 2008) (citations and internal quotations omitted). SSBG

---

[4]The court need not construe additional "means for" limitations to resolve the issues at bar. In this regard, however, the court notes that, generally, neither the claimed function nor the identity of the corresponding structure in the specification is in dispute – only whether the court would define the terms as including all capable corresponding structures known in the art, not just those disclosed in the specification. Not surprisingly, SSBG (as the patent holder) is seeking to broaden the scope of the asserted claims to capture new technology.

7

does not identify any particular (equivalent) structures available in 1996 and instead proposes that the court construe the claims, in the first instance, as including "well known . . . devices generally." (D.I. 337 at 34, 35) In view of the intrinsic evidence, the court declines. SSBG may prove infringement by after-arising technology under a doctrine of equivalents analysis,[5] but may not expand the scope of literal infringement by subsuming all theoretically known structural equivalents (as of 1996) within the scope of the claims.

3. "**A device that provides access by said switching apparatus [to a mobile (phone) packet-switching network/through a line-switching network] through which data packets can be sent for delivery to a destination end terminal**" is, for reasons stated in the court's memorandum opinion of the same date, indefinite.

_____
United States District Judge

---

[5]Equivalence, an issue of fact, is determined by whether the structures "perform the identical function, in substantially the same way, with substantially the same result." *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000).